UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| EBSCO INDUSTRIES, INC., a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CV-03-BE-3253-S |
| BELCO SERVICES, INC., a Pennsylvania corporation,  DAVID A. BELFATTI, an individual, ROBERT ALLEN CHISLOW, an individual and TODD STANGL, an individual, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | | |

**ENTERED**
**FEB 1 2 2004**

## MEMORANDUM OPINION

### I. INTRODUCTION

This cause came to be heard on the motion of plaintiff EBSCO Industries, Inc. for a

preliminary injunction (doc. # 5) against defendants David A. Belfatti, Robert Allen Chislow,

Todd Stangl, and Belco Services, Inc.  EBSCO seeks to restrain Belco, Chislow, Belfatti and

Stangl from using EBSCO confidential information, from contacting EBSCO customers, and to

further enjoin Stangl and Chislow, former employees of EBSCO, from violating the non-

compete covenants in their employment agreements with EBSCO.

This action was filed on December 8, 2003.  EBSCO filed a motion for temporary

restraining order that was denied by the court on December 16, 2003.  *See* doc. # 13.  A hearing

on the plaintiff's motion for preliminary injunction was heard on January 20, 2004.  However, on

December 16, 2003, the court entered a consent order restraining the defendants from contacting

EBSCO customers until 5:00 p.m. on January 20, 2004.

On January 20, 2004, the court extended the provisions of the consent order until such

time as the court ruled on the motion for preliminary injunction.  Represented at the hearing

were EBSCO, Belco, Belfatti and Chislow. Stangl was not present at the hearing and was not represented by counsel. The record shows that Stangl was served with process, including notice of this hearing, on December 31, 2003. The relief entered against Stangl arises both from his failure to appear in this action and defend the claims against him as well as the evidence submitted by the parties.

In accordance with the orders of the court, the parties have submitted affidavits, declarations and deposition testimony as well as documentary evidence. In addition, testimony was taken at the hearing from defendants Chislow and Belfatti and also EBSCO employees Bruce Moore and Scott Ferguson. Through the testimony of these witnesses at the hearing, additional documentary evidence has been admitted into the record. Based on its consideration of the Motion, the First Amended Complaint and the evidence described above,[1] this court finds as follows:

## II. PRELIMINARY FINDINGS OF FACT[2]

1.     EBSCO does business through a number of divisions including Directional Advertising Services ("DAS"). EBSCO's DAS Division is engaged in the business of marketing in reception rooms and other reading areas. DAS has two types of customers: advertisers, which

---

[1] Defendants submitted the declarations of Scott Cook and Michael Chislow in opposition to the pending Motion. In the Order Setting Hearing of December 24, 2003 (Dkt. No. 24), the court allowed the submission of affidavit testimony by either party so long as the affiant was present for cross examination at the hearing. The order of January 6, 2004 (Dkt. No. 31) granting the Joint Motion to Modify Scheduling Order (Dkt. No. 30) did not alter this requirement. However, neither Scott Cook nor Michael Chislow was presented by Defendants for cross examination by EBSCO at either hearing date. Accordingly, the court will not consider the declarations of Scott Cook and Michael Chislow in making the determinations of fact and law set forth herein.

[2] The findings of fact and conclusions of law made by this court are not binding at trial on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (holding that "[a]lthough evidence received at a Rule 65(a) hearing may enter the trial record, the court's findings of fact and conclusions of law with regard to the preliminary injunction are not binding at trial.").

sponsor ads, and "recipients" (also referred to as "reading rooms" or "locations"), which receive magazines which feature the sponsors' ads. The advertiser customers sponsor a gift reading service that is placed in reception rooms and waiting areas of other businesses. The service consists of a series of popular periodicals, a display rack, and protective vinyl binders for each title. Each binder's cover features an advertisement or public service message from the sponsor. Sponsors target different types of reading areas based on the type of prospects they would like to reach and the image they want to project. A sponsor's ad is placed in reading rooms within the sponsor's market area, which is generally the sponsor's city or county. EBSCO's DAS programs are found in places such as doctors' offices, libraries, reception rooms, schools, health clubs, salons, hospitals and senior centers. Both the sponsors and the businesses that accept the service sign agreements with EBSCO for a two year term.

2.     EBSCO's sales representatives solicit businesses to sponsor ads in binders containing magazines to be placed in reading rooms designated in the sponsor's contracts. The sponsor signs a contract in which it agrees to pay for ads to be placed in magazine binders to be placed at locations approved by the sponsor. The sponsor pays fees to EBSCO to cover the cost of magazine subscriptions, magazine racks to be placed at the approved locations, and the sponsor's ads. EBSCO sales representatives contact existing and prospective sponsors of ads, solicit existing sponsors to secure renewals of existing contracts, solicit prospective customers to sponsor ads, and also contact existing and prospective reading room locations to solicit their agreement for EBSCO to place magazine racks and the sponsors' binders at their locations. The sales representative is responsible for securing sponsors' approvals of the locations where binders featuring sponsors' ads are to be placed, listing the locations in each sponsor's contract, and submitting the sponsors' contracts to EBSCO. The sales representative is responsible for

preparing proposed agreements with sponsors and with the locations and securing signed agreements with each type of business.  Upon approval of the contracts, EBSCO prepares the binders with the sponsors' ads and ships the binders for delivery to the reading room locations designated in the sponsors' contracts.

3.      Belfatti is a former EBSCO employee who worked for EBSCO's DAS division as a sales representative and, beginning in 1978, as a territory General Manager in EBSCO's Profit Center 53.  That territory at the time of Belfatti's departure from EBSCO, included the states of Pennsylvania, Maryland, New Jersey, Delaware and West Virginia.  Belfatti worked for EBSCO from May 1971 until he resigned from EBSCO.  EBSCO accepted Belfatti's resignation on November 26, 2001, to be made effective on December 31, 2001.

4.      Belfatti founded Belco in December 2001.  Belco is the only competitor for EBSCO in the geographic area within EBSCO's Profit Center 53.

5.      Stangl was, from late 1996 until June 17, 2002, a sales representative of EBSCO's DAS Division.  Stangl worked as EBSCO's sales representative in EBSCO's territory 5309, which covers several counties in Western Pennsylvania, including the greater Pittsburgh area (namely, the Pennsylvania counties of Allegheny, Armstrong, Beaver, Butler, Clarion, Crawford, Fayette, Greene, Lawrence, Mercer, Venango, Washington and Westmoreland).  Stangl also worked for EBSCO in EBSCO's territory 5306 in Maryland (namely, the counties of Anne Arundel, Baltimore, Baltimore City, Calvert, Carroll, Charles, Frederick, Harford, Howard, Montgomery, Prince Georges and Saint Marys).  While at EBSCO, Defendant Belfatti supervised and managed Stangl.

6.      Following Stangl's termination from EBSCO, Belco employed Stangl as a sales representative.  Based upon the Belco contract documents produced in this matter, Stangl was

employed by Belco no later than January 2, 2003 (the date on his first Belco contract), and Belco's employment of Stangl in this capacity continued at least until March 26, 2003 (the date on his last Belco contract). Stangl is no longer employed by Belco; however, he has reapplied for employment with Belco on at least one occasion since March 26, 2003. According to defendant Belfatti's deposition testimony, defendants Stangl and Belfatti have continued to have contact with each other after March 26, 2003, with one contact occurring in November 2003 before this action was filed and another occurring in January 2004 after the present action was filed.[3]

      7.     Chislow was, from August 15, 1995 until January 31, 2003, a sales representative of EBSCO's DAS Division. Schedule B to Chislow's EBSCO employment agreement designated his sales territory as EBSCO's territory 5314, which initially covered several counties in Central Pennsylvania. On November 8, 1999, Chislow signed an amendment to his agreement with a new Schedule B which expanded EBSCO territory 5314 to include additional counties in Central Pennsylvania and also in West Virginia. The counties shown on Schedule B, as amended, to Chislow's agreement are the following counties in Pennsylvania: Fulton, Potter, Elk, Cameron, Clinton, Jefferson, Clearfield, Centre, Cambria, Blair, Huntingdon, Indiana, Bedford, Somerset, Franklin, Adams, York, Lancaster, Lebanon, Dauphin, Perry, Cumberland, Mufflin, Juniata, Snyder, Tioga, Bradford and Sullivan; and the following counties in West Virginia: Mineral, Hardy, Hampshire, Morgan, Berkeley and Jefferson. While at EBSCO, Belfatti supervised and managed Chislow.

      8.     On two different occasions during Chislow's employment with EBSCO, EBSCO had no sales representative for territory 5309. Territory 5309 therefore, was considered an open territory. On the second of these occasions – October 2002 through January 2003 -- Chislow

---

[3] Deposition of David A. Belfatti, taken January 8, 2004, at 27-30.

was asked by EBSCO management to go into territory 5309 to renew sponsor and reading room contracts for EBSCO customers whose contracts had recently expired or were coming up for renewal.  To further those efforts, EBSCO provided Chislow with a list of all sponsors and reading room locations, including name, addresses, contact name, renewal date and contract amount, for contracts in EBSCO territory 5309 with renewal dates between July 2002 and June 2004 (the "5309 list").  While working in territory 5309, Chislow also solicited and sold new business for EBSCO.

9.      Following his resignation from EBSCO on January 31, 2003, Belco employed Chislow as a sales representative by no later than February 3, 2003, the date of his first sales contract for Belco.  Chislow was employed by Belco in that capacity at the time of the hearing.

10.     Belfatti, Chislow, and Stangl each executed employment agreements with EBSCO.  In their agreements, Chislow, Stangl, and Belfatti each acknowledged the confidentiality of EBSCO customer information, and each agreed to maintain the confidentiality of the information during their employment with EBSCO as well as afterwards.

11.     The EBSCO agreements signed by both Chislow and Stangl contain the following provision:

> **(9)      The Employee acknowledges that, by reason of his/her position, he/she has become acquainted and/or may, in the future, become acquainted or familiarized with the Company's trade secrets and other confidential information, including without limitation, the Company's manner of operation, unique business methods of operation or promotion in the sales of items which are normally part of the Company's business, customer lists, customer identification, purchasing histories, pricing information, and any information treated or expressly designated by the Company as confidential.  The Employee, therefore, agrees that, during the term of this Agreement and after its termination, he/she shall not, in any way, divulge any trade secret or confidential information of the Company or use any such trade secrets or confidential information for any purpose other than in connection with Employee's performing his/her duties under this Agreement.**

> **Employee further agrees that during the term of this Agreement, he/she shall not, in any way, assist, as a principal, employee, or consultant, any of the competitors of the Company, or any persons or companies handling similar lines to that of the Company.**

12.     The EBSCO employment agreements signed by Chislow and Stangl also prohibited them from engaging in certain competitive activity for two years after termination of their employment.  For defendant Chislow, this date is January 31, 2005.  For defendant Stangl, this date is June 17, 2004.

13.     Lastly, the EBSCO employment agreements signed by Chislow and Stangl also provide:

> **(22)    The Employee acknowledges that EBSCO will transfer skills to him/her and provide to him/her customer lists, customer identification, purchasing histories, pricing information and other confidential knowledge and information which will equip him/her to succeed in the sale of the products and/or services of products listed in Schedule "A."**
>
> **In consideration of the foregoing, the training received and to be received during his/her employment by EBSCO, and employment with EBSCO, he/she agrees that during such employment and for a period of two (2) years after termination, however occurring, of that employment, he/she**
>
> **(A)    Will not, directly or indirectly, either alone or as a consultant, adviser, partner, employee, director, agent, stockholder or creditor of any enterprise, in any county or political subdivision which has been assigned to him/her for work as a sales representative of the DAS Division of EBSCO, solicit sales in connection with, or otherwise participate in, any business engaged in the sale or distribution of products or services of the type sold or provided by, or otherwise in competition with, the DAS Division of EBSCO.**
>
> **(B)    Will not, in connection with any business competitive with EBSCO, solicit any customers within any county or political subdivision which has been assigned to him/her (as set out in Exhibit B and all areas heretofore added to Exhibit B by amendment) with which he/she had any contacts while employed by EBSCO or any customer to which Employee has made actual sales.**
>
> **(C)    Agrees that he/she will not in any way, directly, or indirectly, solicit, divert, take away, or interfere with any of the custom, trade, business or patronage of EBSCO, or in any way, directly or indirectly, interfere with any person who shall be employed by EBSCO, or otherwise interfere with**

**any EBSCO business, contractual or employment relationship, including but not limited to inducing any EBSCO employee to violate his/her employment Agreement or to terminate employment with EBSCO.**

**\* \* \***

**(E)     Agrees that, in addition to the right to liquidated damages granted herein, EBSCO is hereby specifically authorized to proceed in any court or courts or competent jurisdiction to obtain an injunction against any breach or threatened breach by him/her of the provisions of this paragraph.**

14.     Belfatti's General Manager Agreement with EBSCO contained a confidentiality clause in which he acknowledged that "all information obtained as a result of his employment concerning EBSCO's cost of goods . . ., the identity of EBSCO's customers and the terms of their advertising contracts, the locations where EBSCO's Reading Service is provided and the identity of recipients of EBSCO's Reading Service is highly confidential..."  That agreement also provides, with regards to confidential information, that "EBSCO shall be entitled to an injunction restraining [Belfatti] from ..." any actual or threatened use of the confidential information provided to Belfatti during his employment with EBSCO.

15.     Belfatti's agreement with EBSCO also contained a covenant not to compete with EBSCO in Profit Center 53 that ran through December 31, 2002.

16.     In connection with their sales responsibilities for EBSCO, EBSCO gave Belfatti, Stangl, and Chislow information and records reflecting the identity of EBSCO's sponsors and businesses where binders promoting sponsors were placed (together, "customers"),  including names and addresses of customer contacts and representatives and information regarding customer contracts (including pricing, renewal dates and locations of binder placements for each sponsor).  This customer information has significant economic value to EBSCO.  Such information is not publicly known and is not generally known in EBSCO's trade or business. Such information cannot be readily ascertained or derived from publicly available information.

Such information has been and is subject to efforts by EBSCO that are reasonable under the circumstances to maintain the secrecy of the information.

17.     Chislow was regularly given this customer information for EBSCO territory 5314 during his employment with EBSCO, and, as set forth above, in November 2003, he was given the 5309 list. Stangl was regularly given this information for EBSCO territory 5309 during his employment with EBSCO. Belfatti regularly had access to this information for all territories in Profit Center 53 since the time he became general manager of EBSCO's Profit Center 53.

18.     Belco has 205 sponsor contracts for its DAS service in the states of Maryland, Delaware, West Virginia, New Jersey and Pennsylvania. These contracts are dated from November 6, 2002, through December 22, 2003. Two of these 205 contracts are dated after December 12, 2003, the date the parties signed the Consent Order in this case restricting Defendants from contacting EBSCO customers.

19.     Of the 203 Belco contracts dated on or before December 12, 2003, 105 of the contracts (51.72%) are with 86 different EBSCO sponsors. Of these 105 contracts with EBSCO sponsors, 74 contracts were sold by Belco representatives on or before the sponsor's renewal date with EBSCO, and another 10 were sold by Belco within 30 days after the sponsor's renewal date with EBSCO.

20.     Of the 76 Belco sponsor contracts secured by defendant Belfatti in this area on or before December 12, 2003, 49 (64.47%) are with EBSCO sponsors. Belfatti admitted that in many cases, he contacted EBSCO customers knowing that they were EBSCO customers. Indeed, the very first contract Belfatti secured after expiration of his non-compete agreement was with Shafer Pharmacy, an account he had personally serviced for EBSCO for more than twenty years. Belco's contract with Shafer Pharmacy is dated January 2, 2003. Between the period of February 5, 2003, and May 19, 2003, Defendant Belfatti secured 28 sponsor contracts

for Belco.  Of these 28 contracts, 27 (96.43%) are with EBSCO sponsors. Based upon the geographic locations of these 27 sponsors, Belfatti traveled hundreds of miles from his home near Philadelphia, Pennsylvania, to solicit these EBSCO accounts.  One such trip took him to Monaca, Pennsylvania – in the Pittsburgh area – to secure a sponsor contract from Med-Fast Pharmacy, a customer on the 5309 list that had been provided by EBSCO to Chislow some three months prior to the date on the Belco contract.  Chislow had been working on the Med-Fast account in the last couple months before he resigned from EBSCO.  His EBSCO supervisor, Bruce Moore, testified that the Med-Fast contracts had not been completed and was still pending at the time of Chislow's resignation.   Belfatti's travel pattern during the period from February 5, 2003 to May 19, 2003 undermines the defendants' claims that their contacts with EBSCO customers were random or inadvertent.

21.  Of the 64 Belco sponsor contracts secured by defendant Chislow on or before December 12, 2003, 35 (54.69%) are with EBSCO sponsors.  Of the 35 Belco contracts sold by Chislow to EBSCO sponsors, 31 of the contract sponsors were on the 5309 list provided to him by EBSCO.[4]

22.     Of the nine Belco sponsor contracts secured by Defendant Stangl, all nine (100%) are EBSCO sponsors.

23.     Michael Chislow, the son of defendant Chislow, has also worked for Belco as a sales representative.  Michael Chislow's work for Belco began while he was still in high school, and Michael Chislow lived in the same house as his father during the entire period that he worked for Belco.  Of the 15 Belco sponsor contracts secured by Michael Chislow, 12 (80%) are

---

[4] In addition to these 31 EBSCO sponsors sold by Chislow, two of the former EBSCO sponsors sold by Belfatti and  one former EBSCO sponsor sold by Stangl for Belco were also on this 5309 list given to Chislow.

with EBSCO sponsors.  Defendant Chislow had been the EBSCO sales representative for all 12 of these EBSCO sponsor contracts.

24.     Of the 105 Belco sponsor contracts with matching EBSCO sponsors, 80 (76.19%) have identically matching reading rooms for the matching sponsor.  The 80 contracts in which the Belco sponsor and reading room locations mirror their EBSCO counterparts involve 121 matching reading room locations.

25.     The Belco contracts produced by defendants show that Belfatti solicited and sold six sponsor contracts in the states of Delaware and Pennsylvania -- states within EBSCO Profit Center 53 -- prior to December 31, 2002, all in direct violation of his non-compete agreement. Belfatti's testimony at the January 20, 2004 hearing confirmed this information.

26.     The Belco contracts show that Stangl solicited and sold one sponsor contract in EBSCO territory 5309.  Defendant Belfatti admitted that Belco accepted this contract – sponsored by the Medicine Shoppe pharmacy in McKees Rock, Pennsylvania --  from Stangl with knowledge that Stangl secured it in violation of his non-compete agreement with EBSCO. In addition, the Belco contracts show that Stangl solicited and sold four sponsor contracts in EBSCO territory 5306 in violation of his EBSCO non-compete agreement.

27.     EBSCO has lost the present renewal business, and in all likelihood has lost the future renewal business, of these existing and former EBSCO customers who are now doing business with Belco.

28.     Many of the EBSCO customers who have signed contracts with Belco were customers who had renewed their two year contracts with EBSCO on at least one occasion before doing business with Belco.

29.     Prior to Belfatti's formation of Belco in December 2001, EBSCO had the same sales representative in territory 5314 (defendant Chislow) for over five years and the same sales

representative in territory 5309 (defendant Stangl) for over four years. Since Belfatti, Chislow and Stangl began competing with EBSCO in territories 5309 and 5314, EBSCO has been unable to consistently employ sales representatives in these territories in part because of the erosion of the EBSCO renewal customer base through sales by Belfatti, Chislow, and Stangl for Belco. As a result, EBSCO has not had long-term sales representatives in place in these territories to either renew existing business or solicit new customers.

30.     EBSCO has also presented evidence of customer confusion arising from Belco's sales activities. The declarations of EBSCO employees Brett Rump, David Higginbotham, and Michael Bouldin, and the deposition testimony of Janet Wurm and Lisa Reich, describe instances where several reading room locations believed they had renewed, or believed they had been contacted by EBSCO about renewing, their reading room services with EBSCO when, in fact, those businesses had been contacted by Belco representatives who informed the locations that it was time to renew their subscription service.

### III. CONCLUSIONS OF LAW[5]

31.     EBSCO's customer information and customer histories are information that (a) is used or intended for use in a trade or business; (b) is included in a compilation; (c) is not publicly known and is not generally known in the trade or business in which EBSCO is engaged; (d) cannot be readily ascertained or derived from publicly available information; (e) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and (f) has significant economic value to EBSCO and its competitors. Accordingly, this information meets the definition of a "trade secret" entitled to protection under the Alabama Trade Secrets Act. *See* ALA. CODE § 8-27-2(1).

---

[5]*See Infra*, at n. 2.

32.     Injunctive relief is a proper remedy when former employees are misappropriating trade secrets and violating non-compete agreements resulting in irreparable harm to their former employer. *See* ALA. CODE § 8-27-4(1)(a); *J.E. Hanger, Inc. v. Scussel*, 937 F. Supp. 1546 (M.D. Ala. 1996); *Booth v. WPMI Television Co.*, 533 So. 2d 209 (Ala. 1988).   To grant a preliminary injunction, the court need not find that the evidence guarantees a final verdict in the plaintiff's favor. *J.E. Hanger*, 937 F. Supp. at 1551.  Rather, the district court must find that the plaintiff has met its burden of demonstrating the following elements: (1) a substantial likelihood that the plaintiff will prevail on the merits; (2) irreparable injury will occur unless an injunction is issued; (3) the potential harm plaintiff faces if relief is not granted outweighs the harm that will occur to the parties against whom the injunction is issued; and (4) the injunction will not disserve the public interest. *Id.*  (citing *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F. 3d 982 (11th Cir. 1995));  *Digitel Corp. v. DeltaCom, Inc.*, 953 F. Supp. 1486, 1494-95 (M.D. Ala. 1996) (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991)).

33.     The court finds as a matter of law a substantial likelihood exists that EBSCO will prevail on the merits of the following claims in this action:

A.      That defendants Belco, Belfatti, Chislow, and Stangl and others working for Belco have used EBSCO trade secrets to solicit EBSCO customers and to obtain orders for Belco.

B.      That defendants Belco, Belfatti, Chislow, and Stangl misappropriated EBSCO trade secrets by using and disclosing such information for defendants' pecuniary benefit.

C.      That defendants Belfatti, Chislow, Stangl, and Belco conspired with each other to use EBSCO confidential information to solicit EBSCO customers for the financial benefit of defendants.

D.      That defendant Chislow breached paragraphs 9, 22(A), and 22(B) of his employment agreement with EBSCO by directly and indirectly soliciting sales for Belco based upon confidential information received during his employment with EBSCO.

E.      That defendant Stangl has breached paragraphs 9, 22(A), and 22(B) of his employment agreement by directly and indirectly soliciting sales for Belco based upon confidential information received during his employment with EBSCO.

F.      That defendant Stangl has violated paragraph 9 of his employment agreement by using EBSCO's confidential information to solicit, and to assist Defendants Belco, Belfatti and Chislow to solicit, business from EBSCO customers and otherwise to compete with EBSCO.

G.      That defendant Belfatti has violated his employment agreement by having used EBSCO's confidential information to solicit, and to assist Defendants Belco, Stangl and Chislow to solicit, business from EBSCO customers and otherwise to compete with EBSCO.

H.      That defendants Belco, Belfatti, and Stangl have conspired with each other to induce defendants Chislow and Stangl to violate their non-compete agreements with EBSCO.

I.      That defendants Belco, Belfatti, and Chislow have tortiously interfered with Stangl's employment agreement with EBSCO; and that Defendants Belco and Belfatti have tortiously interfered with Chislow's employment agreement with EBSCO.

34.     EBSCO has presented sufficient evidence that irreparable injury will occur to EBSCO unless an injunction is issued enjoining the above-described behavior by Defendants. "An injury is irreparable if it cannot be undone through monetary remedies." *Ferrero,* 923 F.2d at 1149. Furthermore, numerous courts have presumed irreparable harm where trade secrets have been misappropriated; after all, "[a] trade secret once lost is, of course, lost forever." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2nd Cir. 1999). In addition, Alabama courts and the Eleventh Circuit have held that the irreparable injury requirement will be met

where a former employee's use and disclosure of his former employer's confidential information and trade secrets will result in a loss of customers and goodwill to the employer. *See Ferrero*, 923 F.2d at 1449; *Digitel Corp.*, 953 F. Supp. at 1498 (holding that lost customers and goodwill are injuries that "would be impossible to calculate monetarily and that [plaintiff] is vulnerable to irreparable harm"); *J.E. Hanger*, 937 F. Supp. at 1159 (citing *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir. 1981). Furthermore, in paragraph 22(E) of Chislow and Stangl's respective employment agreements with EBSCO, Defendants Chislow and Stangl agreed that injunctive relief was proper in the event either violated his non-compete agreement with EBSCO. Likewise, in paragraph 8 of Belfatti's general manager's agreement with EBSCO, Belfatti agreed that injunctive relief was proper if he used, or threatened to use, EBSCO's confidential customer information outside of his employment with EBSCO.

35.     The potential harm EBSCO faces if relief is not granted – the continued loss of present and future renewal business with existing customers -- far outweighs the harm that will occur to Defendants if they are enjoined from soliciting business from EBSCO customers and from soliciting customers in violation of non-compete agreements.    Approximately 100 of Belco's 205 sponsor contracts in the relevant area are with non-EBSCO sponsors.  Furthermore, countless other potential sponsors and reading rooms are in the states of Pennsylvania, New Jersey, Delaware, Maryland and West Virginia – even within the core DAS business – that are not under contract with EBSCO.  Nothing in the injunctive relief set out below prevents Belco and its representatives from soliciting business from these potential customers to the extent such work does not involve a violation by Chislow or Stangl of their non-compete agreements with EBSCO, or does not involve use of EBSCO's confidential information and trade secrets. *See e.g., J.E. Hanger*, 937 F. Supp. at 1556 (stating that "[c]ustomer lists are the backbone of any company" and finding that harm to former employer outweighed potential damage to former

employee's livelihood); *Digitel Corp.*, 953 F. Supp. at 1498 (potential significant losses in commissions outweighed by loss of customers and goodwill, particularly since former employers not restricted from practicing their trade altogether and not forced to quit new jobs).

      36.    The injunction set forth below will not disserve the public interest. The public interest supports allowing a company, such as EBSCO, to protect its trade secrets, especially in this situation where the employees who misappropriated and disclosed the trade secrets had signed agreements not to do so. A condition of defendants' employment that they voluntarily accepted was an agreement prohibiting them from disclosing confidential information related to EBSCO's business. EBSCO has presented strong evidence to the court that Defendants have used and also disclosed such information and that this use and disclosure has significantly damaged EBSCO. As such, to protect EBSCO and enjoin Defendants from engaging in further misconduct is in the public interest. Additionally, Defendants are not being prohibited from engaging in gainful employment, nor are they being prohibited from all work within EBSCO's and Belco's shared industry by providing the same services as EBSCO and competing against EBSCO. Defendants are simply being enjoined from contacting existing EBSCO customers and from competing with EBSCO in locations defined in Stangl's and Chislow's noncompetition agreements. Indeed, the public interest is served by the enforcement of valid contracts, and thus, a preliminary injunction ceasing the violation of the agreements in this matter will advance this interest. *See J.E. Hanger, Inc.*, 937 F. Supp. at 1556; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Masri*, 1996 U.S. Dist. LEXIS 7184, at *12 (E.D. Pa. May 28, 1996) ("Issuing a preliminary injunction serves the public interests of enforcing valid contractual provisions and protecting business investments and confidential customer information."). This conclusion holds

true regardless of any argument that EBSCO's "customers have an interest in access to a free and open market." *Digitel Corp.*, 935 F. Supp. at 1498.

## IV. CONCLUSION

Based upon the above and foregoing, Plaintiff EBSCO Industries, Inc.'s Motion for Preliminary Injunction is due to be, and will be, GRANTED. A separate order detailing the scope of the preliminary injunction, along with attachments to be filed under seal, will be entered contemporaneously with this Memorandum Opinion.

DONE and ORDERED this /$2^{th}$ day of February, 2004.

KARON O. BOWDRE
UNITED STATES DISTRICT JUDGE